United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMAL AUSTIN,<br><br>    Plaintiff,<br><br>v.<br><br>THE COUNTY OF ALAMEDA, *et al.*,<br><br>    Defendants.<br>_____/ | No. C-15-0942 EMC<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, AND (2) GRANTING DEFENDANTS' MOTION FOR A MORE DEFINITIVE STATEMENT**<br><br>**(Docket No. 6)** |

## I. INTRODUCTION

Plaintiff Jamal Austin brings this lawsuit *pro se* against the County of Alameda (County) and Alameda County Sheriff's Deputies McBride and Nagy (collectively, Individual Defendants). While Austin's complaint is long and sometimes difficult to decipher, the gravamen of his allegations is that the Individual Defendants, along with other unnamed deputies, violently beat Austin while he was in pre-trial custody, and then failed to ensure that Austin got adequate medical care for his injuries. *See generally* Docket No. 1 (Complaint).

Pending before the Court is Defendants' motion to dismiss Austin's complaint or, in the alternative, for a more definite statement. Docket No. 6. Despite Defendants' arguments to the contrary, it is clear that Austin has stated a plausible claim against McBride, Nagy, and the Doe defendants for both excessive force and deliberate indifference to his medical needs. And while Austin has not pleaded sufficient facts to allow him to proceed under a *Monell* theory against the County, he may proceed against the County under California law. The Court therefore denies

Defendants' motion to dismiss in significant part. Nevertheless, the Court will grant Defendants' motion for a more definite statement: While Austin's complaint states a claim for excessive force and deliberate indifference, the complaint contains a good deal of extraneous and seemingly irrelevant information that should be removed from Austin's amended complaint so that Defendants can adequately respond to Austin's allegations.

## II. BACKGROUND

In March 2014, Austin was a pretrial detainee in the custody of the Alameda County Sheriff's Department. *See* Complaint at 1, 4. He was housed at Santa Rita County Jail. *Id.* at 1.

On March 12, 2014, Austin appeared before Judge Delucchi in Department 11 of the Alameda Superior Court for a pretrial motions hearing. *Id*. at 4-5. He was representing himself in his criminal case. *Id*. Austin had filed a motion to recuse the Judge, but because he did not want "to cause embarrassment by saying out loud the gist of that motion" he "suggested simply that the Judge take it under submission." *Id*. at 6. Austin intended to discuss other motions with Judge Delucchi, but as he began to "explain the gist of his other motions," he was "violently yanked" from behind by Deputy McBride. *Id*. McBride pulled Austin so hard that Austin's shoes and eyeglasses "scattered" inside the courtroom. *Id*. According to Austin, he was peaceful throughout the entire court proceeding, and McBride acted without any provocation whatsoever. *Id*. at 4, 6-7.

McBride removed Austin from the courtroom and "continued man-handling Plaintiff from behind." Complaint at 7. McBride had Austin in a headlock and dragged Austin up a flight of stairs by the neck. *Id*. Once they reached the floor above the courtroom, another unnamed officer "buzzed" Austin into an area where other pretrial detainees were being housed. *Id*. McBride then slammed Austin against the wall and kneed Austin in the testicles, "causing Plaintiff to fall to his knees screaming in pain." *Id*. Once Austin was on the ground, McBride used significant force to "hog-tie" Austin's legs together, and a number of other deputies assisted McBride is hand-cuffing Austin. *Id*. at 8. Austin was then put on an elevator where "more punching and rough-housing occurred." *Id*.

By the time the elevator reached the "tower" section of the Oakland courthouse, Austin could not stand under his own power. Complaint at 8. Deputies took Austin to an "isolated" cell away

from the other inmates, where he was "left alone in pain." *Id*. Austin states that at some later point during his criminal proceedings, McBride "made statements which caused Austin to believe" that McBride had a "retaliatory motive" for beating him.[1] *Id*. at 6.

Later on March 12, an unnamed deputy returned to Austin's cell to bring him downstairs for further proceedings in Department 5. Complaint at 8. Austin informed the deputy that he could not stand because he was in excruciating pain. *Id*. Consequently, the deputy went to fetch a wheelchair for Austin. *Id*. Seemingly while the one deputy went to retrieve a wheelchair, a second deputy – described as Caucasian with eyeglasses – began to "taunt and badger" Austin. *Id*. While Austin was on his knees handcuffed, this deputy punched Austin in the face and then pushed Austin's head to the floor with considerable force. *Id*. at 8-9. Austin was eventually taken downstairs to Department 5, where Judge Stuart Hing was presiding. *Id*. at 9.

Judge Hing was apparently disturbed that Austin appeared in his courtroom in a wheelchair, and "opted at that time not to conduct trial proceedings." Complaint at 9. Rather, Judge Hing ordered that Austin be "seen by a medical doctor 'forthwith.'" *Id*. The deputies did not comply with this order, however, instead returning Austin to the isolated cell in the tower area to wait for the transport bus back to Santa Rita. *Id*.

Once the transport bus arrived at the courthouse, deputies demanded that Austin get out of his wheelchair and move from his cell in the tower to where the bus was located. Complaint at 9. The deputies threatened to beat Austin if he did not get out of the wheelchair. *Id*. Austin did so, but because he unable to walk he had to crawl onto the elevator, and then "crawled from [the] elevator on [the] ground floor up to [the] transport bus attempting to grab hold of the steps of the transport bus, trying to pull [my]self up without voluntary deputy aid or assistance." *Id*. Once the bus arrived back at Santa Rita jail, Austin was again forced to "crawl off the transport bus, crawl on the ground, and crawl into a nearby holding tank." *Id.* at 10.

At some point, an African American Deputy Austin believes is named Brown came up to Austin in the holding tank and asked Austin about his condition. Complaint at 10. Austin told

---

[1] Austin seems to suggest that he was disliked by certain deputies because he filed a number of inmate grievances during his time at Santa Rita jail. *See* Complaint at 17.

3

Brown that he could not walk because of the force used against him at the courthouse. *Id.* Brown asked Austin whether anyone had taken pictures of him yet, and Austin responded that no one had photographed him. *Id.* Brown then instructed Deputy Nagy to retrieve a wheelchair for Austin. *Id.* Austin claims he was later photographed by deputies while seated in the wheelchair. *Id.* at 15.

Nagy took Austin in the wheelchair to see an on-duty nurse, who checked Austin's vital signs. Complaint at 15. The nurse did not make any effort to *treat* Austin's injuries, however, despite that fact that Austin was "unable to stand or walk without considerable pain." *Id.* at 16. Nagy then took Austin back to the holding tank, where he threatened Austin and told him to get out of the wheelchair. *Id.* at 16-17. Nagy further told Austin that he did not care about the Judge Hing's order that Austin be taken to a doctor, told Austin "nothing [is] wrong with [you]," and stated that Austin "went to Court and opened his big mouth . . . and got what he deserved." *Id.* at 17 (ellipsis in original). Nagy also told Austin that he must have "done something to deserve" the beating, and informed Austin that he remembered all the "trouble" Austin caused by writing inmate grievances when Austin was imprisoned in a section of the jail under Nagy's supervision. *Id.* When Austin did not get out of the wheelchair, Nagy grabbed hold of Austin, who then "slid down" from the wheelchair. *Id.* Nagy then "angrily slammed the cell door of the holding tank." *Id.* Austin was "left alone for hours, crying" on the dirty floor of the holding cell, *id.* 16-17, "afraid to climb back into the wheelchair because of Deputy Nagy's words." *Id.* at 17. Austin did not receive any food that evening, nor did he receive his seizure medication. *Id.* Austin never saw a doctor as ordered by Judge Hing. *Id.*

The next day, March 13, 2014, Austin was again brought before Judge Hing in a wheelchair. Compliant at 18. Judge Hing once again ordered Austin be brought to a doctor. *Id.* Once out of court, however, Austin was threatened by deputies to get out of his wheelchair. *Id.* Austin was not taken to a doctor. *Id.* Austin appeared before Judge Hing again on March 17, March 19, and March 20. *Id.* He never saw a doctor during this period either. *Id.*

Finally, Austin alleges that during the remainder of his pre-trial detention, the deputies in his housing unit at Santa Rita jail were "apparently split on what to do about the wheelchair accommodation." Complaint at 19. Some deputies would come and take Austin's wheelchair away

4

from him, and later other deputies would fetch a wheelchair for Austin's use. *Id.* Austin also observed during a court appearance that deputies obtained a wheelchair for a Caucasian detainee without a court or doctor's order. *Id.* at 20. When they returned from court, deputies permitted this white detainee to return to his housing unit with the other inmates, but made Austin remain up front in the "ITR section" of the jail "apparently to punish Plaintiff." *Id.* at 21. Austin is African American. *Id.* at 2.

According to Austin, he wrote letters to his family about his mistreatment by Sheriff's deputies, and also made complaints "to Department 5" (presumably Judge Hing) and to internal affairs. Complaint at 26. These complaints were apparently not fruitful. Austin was released from jail in September 2014. *Id.* He is currently homeless and proceeding *in forma pauperis*. *Id.*

Austin filed this action against the County and the Individual Defendants on March 2, 2015. The cover-page of his 28 page complaint indicates that the suit is brought under 42 U.S.C. section 1983, as well as under California law. *See* Complaint at 1. Defendants filed the instant motion to dismiss, or, in the alternative, for a more definite statement, on March 30, 2015. On April 29, 2015, Austin filed a "Supplemental Complaint," which this Court construes as an opposition to Defendants' motion. Docket No. 15. Defendants filed a reply, and a hearing was held on the matter on June 11, 2015. Austin failed to appear at the hearing. *See* Docket No. 19. Two days before the hearing, Austin mailed a letter to the Court indicating that he would be unable to attend the June 11 hearing due to an unexpected health condition. *See* Docket No. 20. Unfortunately, Austin's letter was not filed on the Court's electronic docketing system or otherwise received in chambers until June 12; the day after the hearing took place.

### III.  DISCUSSION

Defendants argue that Austin's complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because he has not stated a claim for which relief can be granted. Specifically, Defendants argue that Austin's complaint is devoid of sufficient factual matter to indicate that any constitutional violation occurred. *See* Mot. at 4-16. Defendants are wrong. Austin pleaded a significant amount of factual material that, if believed, shows that the Individual Defendants used excessive force against him and were deliberately indifferent to his medical needs.

5

Austin's complaint further contains sufficient facts to state a claim for excessive force or deliberate indifference against at least some unidentified deputies.

Defendants also argue that Austin's allegations against the County should be dismissed because Austin has not pleaded facts to show that a County policy or practice was the moving force behind the constitutional violations at issue. Defendants are correct that Austin has not pleaded sufficient facts to get past the pleading stage on his *Monell* claim. But even though Austin cannot currently proceed against the County under federal law, California has expressly rejected the *Monell* rule in respect to state law claims. *See Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013) (explaining that "California has rejected the *Monell* rule"). Under California law, a plaintiff may hold a municipal entity directly liable for constitutional torts committed by its employees under a respondeat superior theory. Thus, Austin's state law claims against the County can continue.

While the Court finds that Defendants' motion to dismiss is largely without merit, Defendants appropriately seek a more definite statement. Austin's complaint contains a number of extraneous or potentially irrelevant facts that make it difficult for the Defendants to frame a responsive pleading. Thus, the Court will require Austin to file an amended complaint that contains a "*short* and *plain* statement of [his] claim." *See* Fed. R. Civ. P. 8(a)(2) (emphases added). Austin is once again advised to consult with an attorney or visit this Court's *pro se* help desk for assistance in drafting such an amended complaint.

A.   Applicable Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This court has "an obligation where the [plaintiff] is *pro se*, particularly in civil rights cases, to construe the pleadings liberally and to afford the [plaintiff] the benefit of any doubt." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (citation omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

Under Rule 12(e), a court may order a more definite statement if "a pleading . . . is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). While motions for a more definite statement "are viewed with disfavor" because of

the "minimal pleading requirements of the Federal Rules," a court should grant such a motion where "the complaint is so general that ambiguity arises in determining the nature of the claim or the parties against whom it is being made." *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1077 (C.D. Cal. 1994); *see also McHenry v. Renne*, 84 F.3d 1172, 1179-80 (9th Cir. 1996) (motion for more definite statement is appropriate where complaint is "prolix" and "confusing").

B.   <u>Austin Has Adequately Pleaded an Excessive Force Claim Against the Individual Defendants</u>

"Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eight Amendment." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979)).  Because "pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards." *Frost*, 152 F.3d at 1128 (citing *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991)).

The Supreme Court has often held that the "use of excessive physical force against a prisoner may constitute cruel and unusual punishment." *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (per curiam) (citing *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).  Where a state actor applies force to a detainee "maliciously and sadistically to cause harm," the Eighth Amendment is violated. *Wilkins*, 559 U.S. at 37.  Thus, a pretrial detainee who pleads facts that plausibly demonstrate that he was "gratuitously beaten by guards," *id.* at 38, has successfully stated a claim under the Due Process Clause of the Fourteenth Amendment.

Here, Austin has pleaded sufficient facts to state a plausible claim against Deputy McBride. Among other things, Austin claims that McBride violently yanked him from behind, pulled him up a flight of stairs by the neck, and kneed Austin in the groin. *See* Complaint at 7.  Austin's complaint alleges that he was acting peacefully, and McBride acted without provocation. *Id.* at 4, 6-7.  Thus, Austin has stated a plausible claim that McBride "maliciously and sadistically" used excessive force against him. *See Wilkins*, 559 U.S. at 38 (reversing dismissal of claims alleging that prison guards "punched, kicked, kneed, choked, and body slammed" plaintiff without "any provocation").

Similarly, there is no question that Austin has pleaded sufficient facts against certain of the Doe defendants.  For instance, there can be no doubt that the "Caucasian Sheriff's Deputy with

glasses" could be liable for violating Austin's constitutional rights if, as alleged, he punched Austin in the face without provocation and forced Austin's head to the ground by applying substantial pressure to his neck. *See* Complaint at 8. And while it presents a closer question, the Court concludes that Austin's excessive force allegation against Deputy Nagy is also well pleaded, especially given this Court's duty to construe Austin's pleading in the light most favorable to him while affording him the benefit of "any doubt." *Akhtar*, 698 F.3d at 1212. According to Austin, Nagy verbally threatened him, demanded that he get out of his wheelchair (which Austin was in because he claims other deputies had beaten him to the point he could not walk) and then apparently "grab[ed] hold of Plaintiff," causing him to fall out of the wheelchair. Complaint at 17. Plaintiff then remained on the ground for hours because he was so frightened of Nagy. *Id.* While not every "push or shove" will be actionable under the constitution, *Wilkins*, 559 U.S. at 38, the facts pleaded here are sufficient to put Nagy on notice of the claim against him, and to allow him to adequately defend himself. *See Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011) (holding that a complaint "is required only to give notice of the claim such that the opposing party may defend himself or herself effectively"); *see also Cameron*, 713 F.3d at 1021 (explaining that "the propriety of a particular use of force is generally an issue for the jury") (citation omitted). If it turns out that Nagy's physical contact with Austin was relatively minor, Nagy can always file an appropriate motion at a later stage in these proceedings.

      Defendants argue that Austin's complaint for excessive force is inadequate because he does sufficiently describe the laws Defendants apparently violated. For instance, Defendants argue that Austin does not even invoke section 1983 in the body of his complaint, or state with specificity that he is suing under the Due Process Clause of the 14th Amendment. While it is true that the body of Austin's complaint does not mention section 1983, the caption page clearly indicates that the complaint is brought under 42 U.S.C. section 1983 for "excessive force." Complaint at 1. In any event, the law of the Ninth Circuit is clear: A *pro se* plaintiff "'is not required to state the statutory or constitutional basis for his claim, only the facts underlying it.'" *McHenry*, 84 F.3d at 1179 (quoting *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1223 (9th Cir. 1990)). Here, Austin has pleaded detailed facts that form the basis of his excessive force claim. He is not required to state

1  the specific laws Defendants violated, and so Defendants' motion to dismiss on this ground is
2  denied.
3  C.	Austin Has Adequately Pleaded That The Individual Defendants Were Deliberately
4  	Indifferent to His Medical Needs

Pretrial detainees may prosecute an action for deliberate indifference to their medical needs under the Fourteenth Amendment Due Process clause. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1242-44 (9th Cir. 2010). As with Austin's excessive force claims brought under the Fourteenth Amendment, the legal standards that apply to a deliberate indifference claim prosecuted by a pretrial detainee are the same as those that apply to prisoners under the Eighth Amendment. *Id.* at 1244.

In order to state a constitutional claim for deliberate indifference to medical needs, a plaintiff needs to plead sufficient facts that satisfy just two elements. First, the plaintiff must show that he had an objectively serious medical need. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). "Examples of serious medical needs include the existence of an injury that a reasonable doctor or patient would find important or worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* Second, the plaintiff must show that prison officials were deliberately indifferent to his objectively serious medical need. *Id.* Deliberate indifference requires that a defendant be subjectively aware of the serious medical need and fail to adequately respond to that need. *See Lemire v. Cal. Dept. of Corrections and Rehabilitation*, 726 F.3d 1062, 1082 (9th Cir. 2013). Put differently, "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment . . . ." *Lopez*, 203 F.3d at 1131 (citation omitted).

There can be no dispute that Austin has adequately pleaded the first prong of a deliberate indifference claim – an objectively serious medical need. *See Lopez*, 203 F.3d at 1131. Among other things, Austin alleges that he was so badly beaten by guards he could not stand up, and needed a wheelchair to get around. *See* Complaint at 8. These allegations clearly indicate that Austin was

in "substantial pain" and/or suffered an injury that "a reasonable doctor or patient would find important or worthy of comment or treatment." *Lopez*, 203 F.3d at 1131.

   Austin has also adequately pleaded the second prong of his deliberate indifference claim against the Individual Defendants. There is no disputing that, as alleged, McBride had a subjective awareness of Austin's objectively serious medical needs; according to Austin, it was McBride who was largely responsible for Austin's condition because McBride was one of the deputies who battered him. *See* Complaint at 7-8. And Austin's complaint plainly alleges that McBride never provided him with any medical treatment. Thus, McBride could be held liable for displaying deliberate indifference to Austin's medical needs. *See Lemire*, 726 F.3d at 1082-83 (explaining that a "failure to act given the patent nature of the inmate's condition . . . is conduct sufficiently severe to evidence an Eighth Amendment violation") (internal modifications omitted) (citation omitted).

   The same can be said of at least some of the Doe defendants. For instance, any of the Sheriff's deputies that Austin alleges witnessed him as he was forced to crawl onto and off of the prison transport bus because he was unable to walk without assistance would have had a subjective awareness of Austin's serious medical needs. Austin's complaint fairly alleges that he never received adequate medical care despite these Doe defendants' subjective knowledge of his serious medical needs. Thus these Doe defendants could be found liable for deliberate indifference. *See Lemire*, 726 F.3d at 1083 (explaining that the failure to provide medical care to an obviously injured inmate can amount to deliberate indifference under certain circumstances).

   Finally, viewing Austin's complaint with the necessary liberality afforded *pro se* litigants, the Court concludes that Austin has stated a deliberate indifference claim against Nagy. A fair reading of Nagy's complaint indicates that it is at least plausible that Nagy would have been subjectively aware of Austin's serious medical needs. The Court so concludes because any reasonable prison guard who viewed a prisoner who had been beaten as badly as Austin claims he was would likely have understood that Austin was suffering with an objectively serious medical need. Put differently, the Court finds that a reasonable inference to draw from the facts pleaded in Austin's complaint is that the beating administered to him likely resulted in visible symptoms that would have been obviously apparent to anyone (like Nagy) who saw him shortly after the relevant

incident(s), and that anyone who viewed such an obviously injured inmate would similarly understand that such an inmate was in need of medical treatment.[2] *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (holding that the deliberate indifference prong may be satisfied even absent a defendant's actual subjective awareness of the risk of harm posed the plaintiff where that risk would be "obvious" to a reasonable prison official); *Lemire*, 726 F.3d at 1083 (explaining that the failure to provide medical care to an obviously injured inmate can amount to deliberate indifference). Indeed, this is a particularly appropriate inference to draw here in light of two specific factual allegations in Austin's complaint. First, Austin alleges that immediately after he returned to Santa Rita jail, Deputy Brown inquired whether anyone had taken "Plaintiff's photos yet." Complaint at 10. One reasonable inference to draw from this allegation is that Austin had visible injuries that Deputy Brown wished to document.[3] According to the complaint, Nagy was present at roughly the same time Brown authorized that photos be taken of Austin. Thus, it is plausible that Nagy saw the same injuries that Brown saw. Moreover, Austin alleges that the judge presiding over his criminal trial twice ordered Austin taken to a doctor for medical treatment because of his concern about Austin's injuries – injuries one can fairly assume must have been visible and apparent to the judge simply by observing Austin from the bench. Complaint at 9, 18. Taken together, and in the light most favorable to Austin, the complaint fairly alleges that Nagy must have had knowledge of Austin's medical need(s) because he personally viewed Austin's injuries. Thus, Nagy had a constitutional duty to see that Austin got appropriate medical care. *See Lopez*, 203 F.3d at 1133.

Defendants point out that Nagy *did* provide Austin with some medical care. According to the complaint, Nagy took Austin in a wheelchair to see an "on-duty nurse" at the jail. Complaint at 15. Critically, however, Nagy alleges that the nurse "only took Plaintiff's vitals" and did not provide any other medical care or administer any treatment. *Id.* In light of Austin's detailed

---

[2] For instance, Austin complains that he was punched in the face on multiple occasions. It is at least plausible that Austin could have been profusely bleeding – a clear outward sign that an individual may need medical attention.

[3] Of course, another reasonable inference is that Austin did *not* have any visible injuries, and Brown wished to photograph Austin to later rebut Austin's claim that he had been assaulted by prison staff. On a motion to dismiss, however, the nonmoving party is entitled to the benefit of reasonable inferences, not the movant.

11

allegations regarding his medical condition, and in particular his allegation that he was so badly injured that he could not walk, the nurse's perfunctory examination of him was insufficient under the Constitution. *See Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (9th Cir. 2014) (en banc) (explaining that a "prison official is deliberately indifferent" if she "knows of and disregards an excessive risk to inmate health" by "fail[ing] to treat" a "significant injury" that will result in "the unnecessary and wanton infliction of pain") (citations omitted). It is true that a prison employee may be found not to have been deliberately indifferent because he or she brought the inmate to see a medical professional. *See Lemire*, 726 F.3d at 1084 (explaining that prison staff are not typically liable for deliberate indifference where they "*reasonably* rely[] on the actions of the medical responders") (emphasis added). However, the fact that Nagy brought Austin to see the on-duty nurse does not preclude a deliberate indifference claim per se, at least under the facts as alleged here: Nagy can be held directly liable for his "acquiescence or culpable indifference" to Austin's medical needs by failing to take additional steps to see that Austin received at least facially adequate medical care.[4] *See Starr*, 652 F.3d at 1208; *Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (explaining that a prison official who chooses to "rely upon a medical opinion which a reasonable person would likely determine to be inferior . . . may have amounted to the denial of medical treatment, and the unnecessary and wanton infliction of pain") (internal quotation marks omitted) (citation omitted). Additionally, the Court observes that Nagy's deliberate indifference can further be reasonably inferred from his comments to Austin that: (1) he "did not give a[n] (expletive) about the court order" that Austin be taken to a doctor for medical treatment; (2) that there was "nothing wrong with him"; (3) that Austin should "accept what happened" or otherwise he'd be left in an isolated cell "all night"; and (4) that Austin "must have done something to deserve" the beating he received. Complaint at 17.

---

[4] Had the nurse provided *some* treatment – or even had Nagy reasonably thought that the nurse provided some treatment – the Court's analysis would likely be different. A prison guard cannot usually be expected to second guess the treatment decisions of trained medical staff. *See Lemire*, 726 F.3d at 1084. But where a medical staff member provides *no* treatment for a prisoner's serious medical need whatsoever, a deliberate indifference claim may still lie against a guard who has knowledge of both the prisoner's need and the inadequate care received. *See generally Lemire*, 726 F.3d at 1082-83; *Peralta*, 744 F.3d at 1081-82. Here, Austin alleges he received no treatment from the on-duty nurse.

At bottom, Austin has stated a claim for deliberate indifference against McBride, Nagy, and certain Doe defendants. Whether Austin can prove such violations is another matter, and one which this Court must reserve for another day.

D.  Austin's Claims Against the County

A plaintiff who suffered a constitutional injury may recover from a responsible municipal entity under federal law in three different ways. *See generally Clouthier*, 591 F.3d at 1249. Only two of these possible methods could apply here. "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Id.* (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J. concurring)). Alternatively, a plaintiff may recover under federal law against a municipal entity where the local government failed to "adequately train its employees" and the government's omission amounted to "deliberate indifference" to a constitutional right. *Clouthier*, 591 F.3d at 1249. "This standard is met when 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Here, the only facts Austin pleaded regarding a County policy pertain to the jail's "sick call" procedures. *See* Complaint at 19-20. According to Austin, the County's sick call system is inadequate for inmates, like himself, who are in need of immediate medical attention. *Id.* This is because a sick call request is processed by U.S. Mail, and inmates "must patiently wait in line amid a population of 4,000 others who may need attention." *Id.* at 19. And while Austin acknowledges there is a separate system in place for detainees in need of emergency medical attention, he claims that the County has a "policy/custom of not responding adequately" to such emergency complaints. *Id.*

While Austin could theoretically be correct that the County's sick call system is constitutionally inadequate, it is irrelevant here because Austin does not claim that he ever made a sick call request that was denied or otherwise delayed by the County and that resulted in Austin

13

1  suffering a constitutionally significant injury.[5]  Nor has Austin pleaded any facts that support his
2  allegation that the County's emergency medical protocols are inadequate.  Conclusory statements
3  that a policy is inadequate, without more, are insufficient to state a plausible claim to relief under
4  *Monell*.  *See Clouthier*, 591 F.3d at 1249.

5  Nor has Austin adequately pleaded a failure to train claim.  At best, Austin's complaint
6  merely states, as a legal conclusion, that the County's training policies were inadequate.  Without
7  any facts regarding what those training polices were, or why they were defective, Austin cannot
8  proceed against the County under federal law.[6]  *See Iqbal*, 556 U.S. at 678.

9  Although Austin cannot currently proceed against the County under federal law, he may
10 continue his suit against the County under state law.  As the Ninth Circuit recently explained,
11 "California has rejected the *Monell* rule."  *Cameron*, 713 F.3d at 1023 (citing Cal. Gov't Code §
12 815.2).  Thus, "state law 'imposes liability on counties under the doctrine of respondeat superior for
13 acts of county employees; it grants immunity to counties only where the public employee would also
14 be immune.'"  *Id.* (quoting *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002)).  Here,
15 Defendants do not argue (let alone establish) that the individual defendants employed by the County
16 would be immune from liability.  Thus, Austin may currently proceed against the County on his
17 excessive force and deliberate indifference to medical needs claims under California law.  *See* Cal.
18 Civ. Code § 52.1 (providing a cause of action under California law for constitutional violations).[7]

---

[5] Put differently, even if the sick call policy was constitutionally deficient, Austin would not have standing to pursue this claim as the facts are currently alleged in his complaint.  Austin's extraneous allegations regarding the sick call system provide a good example of the type of unexplained excess material which makes it difficult for the Defendants to file an answer, thus necessitating a more definite statement.  *See* Section III.E, *infra*.

[6] Defendants also argue that Austin's request for punitive damages against the County must be dismissed.  Defendants are correct that municipal entities cannot be held liable for punitive damages under section 1983.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  Because Austin has yet to plead a viable 1983 claim against the County, however, this argument is not currently ripe.  Defendants cite no relevant authority that prohibits the award of punitive damages against the County under state law, and so this argument is rejected without prejudice.

[7] While Austin does not mention section 52.1 in his complaint, the caption of the complaint indicates that he intends to bring claims under California law, and asks this Court to exercise its supplemental jurisdiction to hear such claims.  Complaint at 1.  Austin's complaint also discusses the California law rule allowing for the County to be held liable under a respondeat superior theory for the constitutional torts committed by its employees.  *See id.* at 11.

E. <u>Motion for a More Definite Statement</u>

The Court may grant a motion for a more definite statement where the challenged pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Besides the adequately pleaded excessive force and deliberate indifference claims against the Individual and Doe Defendants under both federal and state law, and the adequately pleaded excessive force and deliberate indifference claims against the County under state law, Austin's complaint contains a number of extra factual or conclusory legal assertions that make little sense and which are not connected in any obvious way to a legal wrong or to a specific defendant's conduct. As might be expected from a *pro se* litigant, Austin's complaint is not focused, often rambling, and sometimes difficult to decipher. For instance, it is not apparent whether Austin intends to bring a race discrimination claim, and if he does, which defendants apparently discriminated against him on the basis of his race. Similarly, Austin's complaint raises an apparently generalized objection regarding the County's "sick call" system, and also presents conclusory and vague allegations about the apparent inadequacy of the non-medical inmate grievance system at Santa Rita jail.

Where a complaint contains "narrative ramblings" and it is unclear "how each defendant is implicated by plaintiffs' allegations," the Court may grant a motion for a more definite statement. *See McHenry*, 84 F.3d at 1176. As the Ninth Circuit has held, "[p]rolix, confusing complaints . . . impose unfair burdens on litigants and judges." *Id.* at 1179. Among other problems, complaints like Austin's put defendants "at risk . . . that plaintiffs will surprise them with something new at trial which they reasonably did not understand to be in the case at all, and that the res judicata effects of settlement or judgment will be different from what they reasonable expected." *Id.* at 1180.

The Court finds it appropriate to grant Defendants' request for a more definite statement. Austin is hereby ordered to file an amended complaint that fully complies with Federal Rule of Civil Procedure 8(a)(2), which requires that any complaint must contain a *short* and *plain* statement of the case. Austin should not take a "kitchen-sink" approach to drafting any amended complaint – litigants are not well served by throwing all possible allegations and legal terms into a complaint in an effort to see what will stick. Rather, litigants should strive to draft focused and simple complaints that contain only those factual or legal allegations necessary to state a claim. As discussed above,

the current complaint currently meets that standard with respect to the excessive force and deliberate indifference claims. The Court believes Austin would be well served to focus on these specific allegations in his amended complaint.

## IV. CONCLUSION

Austin has stated federal and state law constitutional claims against the Individual Defendants for excessive force and deliberate indifference to his medical needs. The County may not currently be held liable under federal law for these violations, and thus Defendants' motion to dismiss all federal claims against the County is granted. However, Austin has stated a constitutional claim against the County under California law. Austin is **ORDERED** to file an amended complaint within forty (40) days of the date of this Order. Once again, Austin is advised to consult with the Northern District of California's Legal Help Center, or otherwise consult with an attorney, before filing his amended complaint.

This order disposes of Docket No. 6.

IT IS SO ORDERED.

Dated: June 19, 2015

_____
EDWARD M. CHEN
United States District Judge